Leonard MACCARINI, Plaintiff,

v.

The NEW HAVEN TRAP ROCK COMPANY, Defendant and Third Party Plaintiff,

WESTCHESTER COLPROVIA CORPORATION, Third Party Defendant.

United States District Court
S. D. New York.
Feb. 6, 1957.

James E. Foley, New York City, for plaintiff, Thomas C. Cusack, New York City, of counsel.

Wiggin & Dana, New Haven, Conn., for the New Haven Trap Rock Co., Thew Wright, Jr., John D. Fassett, New Haven, Conn., of counsel.

Rudser & Fitzmaurice, New York City, for Westchester Colprovia Corp., William P. Rafferty, New York City, of counsel.

LEVET, District Judge.

This is a motion by the defendant, the New Haven Trap Rock Company, for a directed verdict and for judgment notwithstanding the jury's disagreement.

The suit was brought by Leonard Maccarini against the New Haven Trap Rock Company (hereinafter called "New Haven" or "defendant") to recover for injuries which he sustained as a result of the alleged negligence of said defendant. In his complaint, plaintiff charges that he was injured on August 5, 1953, while in the employ of the Westchester Colprovia Corporation (hereinafter called "Colprovia"), which operated a plant located in the town of Brewster, New York. The structure, plant and machinery were owned by the defendant, New Haven. Plaintiff alleges that while he was in the process of attempting to move a conveyor belt mounted on wheels on a narrow gauge track and which operated above four storage bins, his left hand was pulled by a rope toward a revolving capstan and was caught between the capstan and the rope which operated the conveyor belt. As a result, he lost his left hand and sustained a broken left arm.

Plaintiff alleges that the defendant was negligent in causing the structure and its machinery, including the ropes, pulleys and appurtenances about which he worked, to be and remain in an unsafe, dangerous and worn condition. He also claims that the defendant was negligent in failing to have the winch pulley (or capstan) and conveyor belt properly and adequately guarded; in failing to provide him with a safe place in which to work, and in failing to take necessary and proper precautions for his safety.

The defendant contends that it was not responsible for plaintiff's injuries because it had leased the property in question to Colprovia and that at the time of the accident it was neither in occupa-

tion nor in control of the premises on which plaintiff was injured.

After deliberating for some time, the jury was unable to arrive at a verdict. After the jury had been discharged, the Court reserved decision on defendant's motions for a directed verdict and for judgment.

■ Before the defendant can be held to answer for the alleged negligence with respect to its conduct toward the plaintiff, it must first be established that it was under a duty to exercise reasonable care for plaintiff's safety in connection with the plant and machinery operated by its tenant, Colprovia. The general rule is that, in the absence of an agreement or statute to the contrary, a landlord is not liable to employees of its tenant for conditions which develop on the premises after possession or control has been transferred to the tenant. Campbell v. Elsie S. Holding Co., 251 N.Y. 446, 167 N.E. 582; Senk v. City Bank Farmers Trust Co., 2 Cir., 1940, 108 F.2d 630. There is no evidence in the record to indicate that any one other than Colprovia was in possession or occupation of the premises in question at the time when plaintiff was injured. Consequently, plaintiff's claim against the defendant hinges upon whether or not the defendant exercised at said time a measure of control over the premises sufficient to establish a duty toward plaintiff.

Plaintiff introduced into evidence excerpts from the deposition of Edward T. Perry, vice president of the defendant, New Haven. Perry stated that the defendant is in the business of selling crushed stone and that the storage bins and machinery were purchased by the defendant in the middle '20s; that the defendant had owned them ever since, although, after having been previously leased to Cooney Brothers, a competitor of Colprovia, the bins had been idle for some time prior to 1952. In February of 1952, a business arrangement was arrived at between Messrs. Perry and Reigeluth on behalf of the defendant and Mr. Leo on behalf of Colprovia, whereby Colprovia was to have the use of the bins or silos at Brewster, New York, in return for which Colprovia was to purchase its trap rock from the defendant. Perry said that under this agreement the defendant was to put the plant in good operating condition, after which Colprovia was to be responsible for maintaining it in proper condition, including the payment of taxes. In his letter to the defendant, dated February 22, 1952 (Exhibit 13), Mr. Leo, the president of Colprovia, set forth his understanding of the agreement, which included the following remarks:

"You agreed to sell us your trap rock stone f. o. b. cars your silos at Brewster, New York on C. N. E. Railroad for calendar year 1952 for the following prices * * *.

* * * * * *

"It is further understood that you will lease these silos to us for rental of $1.00 per year and we will provide the necessary labor for unloading the cars and loading the trucks."

In accordance with this agreement, the defendant proceeded to put the plant in good operating condition for Colprovia's use.

In a letter dated March 26, 1952 (Exhibit 14), Mr. Kemp of Colprovia requested a belt and belt fasteners, which the defendant thereafter shipped to Colprovia (Exhibit 15). Sprockets and chain links were installed at the Brewster plant and the payments for these items were made by the defendant because "this is material that was required to put the bins in proper operating condition." (Exhibit 19) However, in accepting the invoice for these replacements, the defendant informed Colprovia as follows:

"It is our feeling, however, that future replacements of this type should be handled by you, as agreed in our original conversations about the bins. The Transmission Equipment Company of Connecticut in Wallingford has spare sprockets and

pins in stock for you in the event that you want to replace these again. These were ordered for you at your request. I expect that they will want to bill these out to you, and suggest that you get in touch with them so that they can ship the parts to you."

Fred H. Edwards testified that prior to his retirement in May, 1953, he was a superintendent for the defendant for some 42 years, and that in November of 1952, he was sent by the defendant to supervise certain repairs and improvements that were being performed at the Brewster plant. In a letter to the defendant, dated November 25, 1952 (Exhibit C), Seth L. Kemp, supervisor for Colprovia, expressed his company's thanks to Edwards "for the efficient manner in repairing the Brewster unit" and added: "It runs very nice and will [sic] do everything possible to keep it going that way." Edwards noted certain suggestions on the back of this letter (Exhibit L), which were incorporated in a letter dated December 1, 1952 (Exhibit I) to Colprovia from Theodore W. Jones, who was then in charge of production for the defendant. In his letter Jones said:

"We know that you are anxious to do everything possible to keep this plant in good operating condition and consequently are making the following suggestions with this in mind."

There followed a list of suggestions relating to maintenance of the plant.

On January 19, 1953, Mr. Leo of Colprovia wrote to Edwards saying: "I want to thank you for the interest and attention you took in putting this thing in proper shape." (Exhibit 26) In response to this letter, on January 23, 1953, Mr. Perry, on behalf of the defendant, replied:

"We believe now that this plant should be in excellent condition. As I remember our conversation of a year ago we will allow you to use the bins at no charge providing you will assume maintenance not including normal wear and tear. This is as I remember our conversation. Will you please inform me if I am correct in my understanding of this matter." (Exhibit 25)

In a letter dated January 29, 1953 (Exhibit 27), Mr. Leo answered Mr. Perry:

"My understanding of our agreement was similar to yours, if you put the plant in excellent condition so that we would not have to pay for the wear and damage done by Cooney in their operation of the silos we would then maintain these silos and pay for ordinary repairs caused through our operation of your equipment."

The next day Mr. Perry replied to Mr. Leo (Exhibit 28):

"Mr. Edwards reports to me that the equipment in Brewster is now in proper working condition and, since we are in accord in our understanding on the maintenance of these bins, *you will from now on assume all maintenance unless I hear from you to the contrary.*" (Emphasis added.)

Mr. Leo's reply letter of February 3, 1953 (Exhibit 30) did not mention the topic of assumption of maintenance other than to say:

"Furthering our several letters in regard to silos at Brewster, Mr. Kemp was under the impression that the Labor Department will demand a safety measure and ask that a semi-circular guard rail be placed on the ladder to the top and a guard rail placed on either side of the catwalk on the top. We will not borrow trouble until they say it has to be but I am sure you will agree that this is one of the things we shouldn't be held responsible for or have to absorb the cost of these improvements."

In answer to the aforesaid correspondence, Mr. Perry stated in a letter dated February 6, 1953 (Exhibit 31):

"In answer to your letter of February 3rd regarding safety measures for the silos at Brewster, New York, please be advised that the circular guard is already made up and the manufacturer is waiting for favorable weather to install same. If it becomes necessary to install guard rail on either side of the catwalk on top of the silos, we will assume all charges for that installation.

"Will the installation of the circular guard and guard rail on either side of the catwalk to your mind put these bins in a condition where you would assume maintenance other than normal wear and tear, for the time that you continue to use these bins?"

There is no evidence that this question was ever answered by Colprovia. In fact, Mr. Leo testified that he made no reply.

Theodore W. Jones testified for the defendant and said that in December, 1952, one Harold L. Jackson, an independent contractor, was given the job of installing metal guards at the Brewster plant. Mr. Edwards, in testifying for the defendant, said that he inspected the completed repair work on March 19 and 23, 1953. Jackson billed the defendant for the job on March 28, 1953 (Exhibit 29). There is no evidence of any repairs or payments for repairs made by the defendant for the Brewster plant subsequent to March 28, 1953.

Plaintiff testified that in June of 1953, Edwards visited the Brewster plant and that plaintiff complained to him that the use of a rope on the conveyor belt was dangerous and that a clutch should be installed instead. Plaintiff said that Edwards replied that this matter would be taken care of. Edwards testified that this conversation never took place and that he left the employ of the defendant on or about May 15, 1953. On redirect examination, the plaintiff said that this conversation might have taken place in March of 1953.

Charles Leo, president of Colprovia, testified that pursuant to his agreement with the defendant, the defendant was to put the plant in good operating condition and that thereafter all normal and ordinary maintenance due to wear and tear would be performed by Colprovia. Colprovia paid the taxes and electricity for the premises. Mr. Leo said that no formal written lease was executed and that the arrangement was at will.

■ The fact that the parol lease between the defendant and Colprovia did not comply with the requirement of Section 242 of the New York Real Property Law, McK.Unconsol.Laws, c. 50, that the lease be in writing, does not alter the fact that a landlord-tenant relationship was created. Colprovia's possession with the defendant's consent created a tenancy at will. Talamo v. Spitzmiller, 120 N.Y. 37, 23 N.E. 980, 8 L.R.A. 221; Unglish v. Marvin, 128 N.Y. 380, 28 N.E. 634. Accordingly, the defendant's liability, if any, must be determined on the basis of its status as Colprovia's lessor.

■ The courts have carved out several exceptions to the general rule that a landlord is not responsible for conditions which develop after possession has been transferred. Thus, a landlord is under an obligation to disclose to the tenant and his guests the existence of concealed dangerous conditions existing when possession is transferred of which the landlord has reason to know. Cesar v. Karutz, 60 N.Y. 229. In addition, liability may be predicated on a condition existing at the time of the transfer involving an unreasonable risk of harm to others outside of the premises. Kelly v. Washburn, 178 App.Div. 664, 165 N.Y.S. 891. A third basis for liability exists where the leased property is open to the public. Junkermann v. Tilyou Realty Co., 213 N.Y. 404, 108 N.E. 190, L.R.A. 1915F, 700. However, none of the aforementioned exceptional situations is involved in this case. "In a case such as the one before us, involving neither premises abutting upon a public street,

a traveler on a highway nor property open to the public, the *sine qua non* of liability in tort is retention by the landlord of a measure of occupation and control over the leased premises." De Clara v. Barber S. S. Lines, 309 N.Y. 620, 628, 132 N.E.2d 871, 875. In the instant case, there being no evidence that the defendant occupied the Brewster plant at the time of the alleged accident, the sole issue presented is whether or not the defendant exercised the requisite control over the premises.

In Cullings v. Goetz, 256 N.Y. 287, at page 290, 176 N.E. 397, at page 398, Judge Cardozo set forth the general rule that: "Liability in tort is an incident to occupation or control. * * * occupation and control are not reserved through an agreement that the landlord will repair. * * * The landlord has at most a privilege to enter for the doing of the work, and at times not even that if the occupant protests. 'The power of control necessary to raise the duty * * * implies something more than the right or liability to repair the premises. It implies the power and the right to admit people to the premises and to exclude people from them' * * * ". It has also been held that the "Mere reservation by the landlord of the right to inspect the building or to make repairs, if necessary, did not operate to place it in charge of the building or of the particular premises where the accident happened * * * ." Homin v. Cleveland & Whitehill Co., 281 N.Y. 484, 489, 24 N.E.2d 136, 138. However, the courts have held that where the landlord made repairs after the accident, such conduct was sufficient to spell out control. Scudero v. Campbell, 288 N.Y. 328, 43 N.E.2d 66; Noble v. Marx, 298 N.Y. 106, 81 N.E.2d 40. In the Noble case, the facts as stated by the court were as follows:

"The written lease, as we have seen, gives evidence of the right expressly reserved by the defendant landlord to enter the plaintiffs' apartment during reasonable hours 'to ascertain if said premises are kept in proper repair and condition and to make any repairs that the Landlord may deem necessary for the preservation or safety of the premises or appurtenances.' There was also evidence that at the time of making the lease and at various times during the term of the lease prior to the accident agents of the defendant had made unfulfilled oral promises to repair the defective floor condition which later caused the plaintiff's injuries. If this were the only evidence of control exercised by the defendant, it might be true that 'What resulted was not a reservation by an owner of one of the privileges of ownership.' Cullings v. Goetz, supra, 256 N.Y. at page 291, 176 N.E. at page 398. Indeed, the trial court charged in response to a request by the defendant that 'the mere breach of a contract to repair is an academic proposition.'

"But the evidence of control in the case at bar goes further. The defendant, by her own witness, established the fact that three days after the plaintiff was injured her agents entered plaintiffs' apartment and repaired the defective floor condition." 298 N.Y. at page 110, 81 N.E.2d at page 41.

Upon the aforementioned facts, it was concluded that sufficient control had been shown.

The most recent New York Court of Appeals decision on this subject is De Clara v. Barber S. S. Lines, 309 N.Y. 620, at page 629, 132 N.E.2d 871, at page 876, where the court stated that while the requirement of control had not been relaxed, "such control may be demonstrated by a showing of something less than ' "the power and the right to admit people to the premises and to exclude people from them" ' ". In the De Clara case, the landlord agreed to repair the premises and reserved the right to enter at any time to inspect and make such repairs and alterations as it deemed necessary for the safety and preservation of

the premises. Moreover, the tenant had neither the right nor the duty to make repairs. The landlord had its own watchmen to guard the premises and its own superintendent of maintenance with a crew of twenty men to inspect the property, spot the defects and make repairs. Upon these facts the court held: "A landlord who has the right to come and go upon the leased premises as he pleases for the purpose of inspection and repair and who is at liberty to correct any defect as soon as it is found, must be regarded as having thereby reserved a privilege of ownership, sufficient to give rise to liability in tort." 309 N.Y. at page 630, 132 N.E.2d at page 876.

In the instant case there is no evidence that the defendant had "the power and the right to admit people to the premises and to exclude people from them" as stated in Cullings v. Goetz and De Clara v. Barber S. S. Lines, supra. Nor is there any proof that the defendant made or caused to be made any repairs subsequent to August 5, 1953, the date of plaintiff's accident, as was shown in Scudero v. Campbell and Noble v. Marx, supra. There is no proof that the defendant reserved to itself "the right to be exercised in his independent discretion * * * to enter the premises at any and all times and make repairs upon his own responsibility." De Clara v. Barber S. S. Lines, supra, 309 N.Y. at pages 628–629, 132 N.E.2d at page 875. Indeed, the evidence establishes that the defendant merely agreed to put the premises in good condition for Colprovia's use and that thereafter Colprovia was to assume the obligation of maintaining and repairing the premises. In his letter of January 30, 1953 (Exhibit 28), defendant's vice president expressly stated that Colprovia "will from now on assume all maintenance unless I hear from you to the contrary." In reply, Colprovia asked for a guard rail (Exhibit 30), which the defendant thereafter said it would put up, again repeating its belief that Colprovia was to assume responsibility for all further maintenance and repairs (Exhibit 31). There is no evidence in this case, as there was in the De Clara case, supra, that the tenant had neither the right nor the duty to repair the premises, or that the landlord had its own watchmen to guard and police the premises, as well as its own superintendent of maintenance and a crew of men to inspect the premises, spot the defects and make needed repairs.

At most, the evidence establishes that the defendant agreed to repair the premises for Colprovia's use and that it retained the right during this period to inspect the property for this purpose. However, evidence of a landlord's promise to repair and his right to inspect the property in order to make repairs, without more, is not sufficient to give rise to a duty toward invitees of the tenant in occupation of the premises. Cullings v. Goetz; Homin v. Cleveland & Whitehill Co.; Noble v. Marx, supra. Moreover, there is no evidence that the defendant was under any obligation subsequent to March, 1953, to make any additional structural changes or alterations other than those required by governmental authority in order to conform to health and safety laws. See Herald Square Realty Company v. Saks & Company, 215 N.Y. 427, 109 N.E. 545.

Accordingly, I must conclude that there is no proof that the defendant, the New Haven Trap Rock Company, was either in occupation or control of the premises at Brewster, New York, at the time when plaintiff was injured and, therefore, it cannot be held to answer for plaintiff's injuries sustained as a result of his accident. For this reason the defendant's contentions with respect to the issues of negligence, contributory negligence and assumption of risk are academic and need not be considered.

Defendant's motions for a directed verdict and for judgment, notwithstanding the jury's disagreement, are granted.

So ordered.